FOURTH NATIONAL BANK, Respondent, *v.* ST. LOUIS COTTON COMPRESS COMPANY ET AL., Appellants.

### January 10, 1882.

1. Warehouse-receipts made payable to bearer, not transferred by indorsement are not negotiable.

2. "Cotton-notes" are warehouse-receipts, and the transfer of a cotton-note,

without indorsement, conveys no greater rights than a transfer of the cotton would have given.

3. A transfer of a cotton-note is effectual to pass title to the cotton represented by it.

4. An innocent pledgee of a cotton-note takes a title superior to the lien of a vendor who permits the note to pass into the hands of the vendee in such a way as to enable him to pledge it.

APPEAL from the St. Louis Circuit Court, ADAMS, J. *Affirmed*.

SILAS B. JONES, for the appellants: So long as the seller may insist on payment concurrently with delivery he has his lien; and this he may always do unless he has agreed to the contrary. The seller retains his lien until he " utterly relinquishes his possession." — Story on Sales (4th ed.), sect. 283. Marking, boxing, or setting the goods aside does not destroy his lien. — *Id.*, sect. 287; Benj. on Sales (2d Am. ed.), sect. 807. So, if possession is only surrendered for a special purpose, even to the *buyer* himself, the lien is not gone. — Story on Sales, sect. 292; Benj. on Sales, sect. 807. Before the seller's lien is gone, he must have *intentionally* parted with his possession. It is a question of the intention and purpose of the seller, and until he has *intentionally* abandoned his possession for the purpose of giving the buyer possession as *buyer*, the lien exists. — Story on Sales, sect. 292. The seller's possession and lien cannot be divested by the wrongful act of the buyer. — *Parks* v. *Hall*, 2 Pick. 206, 214. The following authorities state and illustrate the doctrine. — Benj. on Sales (2d Am. ed.), sect. 796 *et seq.*; Story on Sales (4th ed.), sect. 281 *et seq.*; *South Co.* v. *Stanard*, 44 Mo. 71; *South Co.* v. *Plant*, 45 Mo. 517; *Arnold* v. *Delano*, 4 Cush. 33; *Cornwall* v. *Haight*, 8 Barb. 327; *Clark* v. *Draper*, 19 N. H. 419; *Bowen* v. *Burk*, 13 Pa. St. 146; *Bloxam* v. *Sanders*, 3 Barn. & Cress. 941, 948. The mere entrusting of possession of a chattel without more to a bailee does not give him the power to divest the owner of his property. —

*Marine Bank* v. *Fiske*, 71 N. Y. 353 ; *Fawcett* v. *Osborne*, 32 Ill. 411 ; *Dean* v. *Yates*, 22 Ohio St. 388 ; *Heacock* v. *Walker*, 1 Tyler, 338 ; *Covill* v. *Hill*, 4 Denio, 323 ; *Nixon* v. *Brown*, 57 N. H. 34 ; *Folson* v. *Batchelder*, 22 N. H. 47 ; *Saltus* v. *Everitt*, 20 Wend. 267 ; *McNeil* v. *National Bank*, 46 N. Y. 325 ; *Moore* v. *Metropolitan Bank*, 55 N. Y. 41. Nor does the mere entrusting of possession of a bill of lading, though indorsed in blank, or warehouse-receipt or delivery order, give the person so entrusted the power to divest the owner of his property. — 1 Smith's Ld. Cas. (pt. 2), 1195 (ed. of 1872) ; *Gurney* v. *Behrend*, 3 El. & Bl. 622, 634 ; *Dows* v. *Perrin*, 16 N. Y. 325, 333 ; *Bank* v. *Railroad Co.*, 13 N. Y. 598, 628 ; *Decan* v. *Shipper*, 35 Pa. St. 239 ; *Barnard* v. *Campbell*, 55 N. Y. 456 ; *Stollenwerck* v. *Thacher*, 115 Mass. 224 ; *Kingsford* v. *Merry*, 1 Hurl. & N. 503.

FINKELNBURG & RASSIEUR, for the respondent : The possessory right or right of lien which Senter & Co. still retained in the cotton, was represented by the warehouse-receipts called cotton-notes. These cotton-notes, according to the evidence of uniform custom in St. Louis, are symbolical of the property itself, and delivery of possession is uniformly effected by surrender of these notes. They would have this effect under the common law in this country, independent of special proof. Warehouse-receipts, though not negotiable in the strict sense, have long been recognized as sufficient to effect delivery of the property they represent. — *Gibson* v. *Stevens*, 8 How. 384 ; *Adams* v. *Folly*, 4 Iowa, 44 ; *Gibson* v. *Bank*, 11 Ohio St. 311. The alleged private arrangement between Senter & Co. and Moss & Co., with its ingenious and complicated scheme of checks and balances, could not affect the Fourth National Bank, which stood in the position of an innocent third party dealing with this property in the ordinary course of business. — *International Bank* v. *German Bank*, 71 Mo. 183, 197 ; *Brundage* v. *Camp*, 21 Ill. 331 ; *McNeil* v. *Tenth*

*National Bank*, 46 N. Y. 329; *Day* v. *Swift*, 48 Me. 368; *Way* v. *Davidson*, 12 Gray, 466. There is a well-settled distinction between the cases where possession of goods is acquired by felony or by fraud. Under the former no rights can pass even to a *bona fide* purchaser; but when the pos_session has been obtained by fraud under color of a con_tract, a *bona fide* purchaser from the fraudulent vendee obtains title. — *Arendale* v. *Morgan*, 5 Sneed, 703, 712; *Rowley* v. *Bigelow*, 12 Pick. 307, 312; *Dittson* v. *Randall*, 33 Me. 202; *Hoffman* v. *Noble*, 6 Metc. 68, 73. The lien of a pledgee and of a vendor are practically identical, so far as the foregoing points are concerned. The lien of a pledgee may be lost against third parties, though good as against the pledgeor. — *Bodenhammer* v. *Newsom*, 5 Jones L. 107; *Way* v. *Davidson*, 12 Gray, 466; *Day* v. *Swift*, 48 Me. 368.

BAKEWELL, J., delivered the opinion of the court.

This is an action of replevin to recover possession of thirty-nine bales of cotton. Plaintiff, on making demand of the compress company, was informed by it that the cotton had been already taken from its possession by defendants Senter & Co., under a writ of replevin, and that the company held the cotton for that firm. On the institution of this suit, Senter & Co. gave bond, and retained the cotton. There was a verdict and judgment for plaintiff.

Plaintiff is a corporation doing a general banking business in the city of St. Louis. The defendant corporation conducts a public warehouse in the same city, for storing and compressing cotton. For the cotton received by it on storage, it issues a receipt, commonly called a cotton-note; one of these notes being issued for each bale. These notes, by the custom of the trade in St. Louis, pass from hand to hand, instead of the cotton itself. The custom, in case of sale or pledge, is to deliver the cotton-notes, and to suffer the cotton to remain in the warehouse until it is needed for

shipment. Each bale is numbered, and there is a corresponding number on the cotton-note. Defendants Senter & Co. are cotton factors in St. Louis. Their business, as such, is to sell to the cotton buyers, who assort and grade the cotton, and sell it to the Eastern consumers. The cotton-notes are delivered together with samples of the cotton, by the compress company to the cotton factor. The cotton factor sells by these samples. When a sale is made by the factor, he sends an order to the compress company to turn the cotton out in the warehouse for inspection. The buyer and the employees of the factor then report to their principals what cotton comes up to the sample ; such cotton only as does so, is accepted. The buyer then calls upon the factor for the cotton-notes. On surrender of these notes to the compress company, the cotton represented by them is delivered by the company to the buyer, or to the transportation company indicated by him. Nothing but the cotton-notes entitles the buyer to take the cotton. If the buyer delays examining the cotton and taking the cotton-notes, he pays the storage after the lapse of five days. After inspection by the buyer, the bales are weighed and marked by the buyer's marks ; and then, if he does not remove them for shipment, they are re-stored in his name.

One J. H. Moss was a cotton buyer in St. Louis, who, before April, 1878, had bought cotton largely from Senter & Co., and from others. In April, 1878, Moss failed and left the state. About six months after his failure, Moss returned to St. Louis. Senter & Co. were heavy losers by the failure of Moss. His credit was gone, and he could no longer get cotton without paying for it. Moss, however, hit upon a plan by which he hoped still to get cotton and to transact business without capital. In order to do this it was necessary to adopt some plan by which the factor would be induced to believe that he was not giving credit to Moss, or looking to his personal responsibility, and that

Moss got none of his cotton until he paid for it. The plan would have been safe enough, if Moss could have been relied upon to carry it out in good faith on his part. Moss, however, acted in bad faith in the matter, and his misconduct led to the present litigation.

The plan suggested by Moss, and accepted by Senter & Co., was this. After the sale, inspection, weighing, and marking of the cotton, Senter & Co. retained possession of the cotton-notes representing the bales then sold, without which Moss could not get them out of the warehouse. When Moss was ready to ship a parcel of cotton, he sent to Senter & Co. a written order for the bales, described by marks and numbers, directing that they should be delivered to one Mears, agent of the North Atlantic Freight Line, by which Moss shipped his cotton. When the cotton-notes were delivered to Mears, he gave to Senter & Co. a receipt of which the following is a specimen: " No. 729. Office North Atlantic Fast Freight Line, Wm. H. Mears, Agent, 312 Chestnut Street, St. Louis, April 26, 1880. Received of Senter & Co. 157 cotton-notes representing 157 bales of cotton ; for which bales of cotton, bills of lading will be issued on return of this receipt. Wm. H. Mears, Agent." These receipts were a printed form, the freight line doing business in like manner with other factors. It was agreed between Moss and Mears, that Mears would get the bales out of the warehouse, and take the trouble of arranging them for shipment. Mears did this in order to get the transportation for his line. Mears was not to deliver the bills of lading to Moss until Moss redelivered the transportation-receipts to Mears, which receipts Moss could not get from Senter & Co. until he had paid for the cotton which they called for. All the arrangements with Mears were made by Moss. Senter & Co. had no conversation with Mears about the matter. Moss told Senter that Mears would do as he and Mears had agreed ; and the receipts of Mears speak for themselves. It usually took a day or two

for the freight line to get the cotton-notes in order for shipment; the matter was troublesome and involved clerical labor.    In pursuance of this arrangement, which Senter & Co. looked upon as a safe one for them, Senter & Co., from September, 1878, to April, 1880, took these receipts from the freight line, several times a week, and also cotton-notes for cotton sold Moss not yet delivered to the line. They sent the receipts to Moss, and he would take up such as he said were ready to be shipped, paying enough in round numbers to cover the receipt taken up by him, and leaving enough to secure Senter & Co. for what he owed them. These payments were made irregularly, in round sums of thousands of dollars, and not for so many bales.    Where payments were made by Moss, Senter & Co. usually surrendered transportation-receipts about equal to the payment. They did not surrender receipts except on payment, but payments were sometimes made without surrender of receipts. Accounts current were rendered from time to time.    It seems to have been understood between Senter & Co. and Moss, that the receipts of the freight line were held by Senter & Co., not for the specific cotton alone, but for any balance due.

From the first, however, the feature of this arrangement which was to secure Senter & Co., was disregarded by Moss and by Mears.    Mears habitually delivered the bills of lading to Moss without requiring a surrender of the receipts given to Senter & Co.; the receipts being brought in by Moss after the cotton was shipped, as it suited him, and sometimes not for more than a week after the shipment.    On May 1, 1880, the cotton for which bills of lading had been issued to Moss, was greatly in excess of the quantity for which receipts had been surrendered by Moss to Mears.    Moss swears that he could not do business without getting the bills of lading in order to raise money in bank to pay for the cotton, and that there was no concealment about the matter.    But it does not appear that Senter

knew anything of this. He swears that he did not know, until some time in April, 1880, that Moss was getting the bills of lading from Mears before Senter surrendered the corresponding receipt. When Senter ascertained, on April 26th, a day or two before Moss failed for the second time, that Mears was delivering the bills of lading to Moss without first getting back the receipts delivered to Senter, there was an angry conversation between Gammage, the chief clerk of Senter, and Mears, in regard to the matter.

On April 26, 1880, Senter & Co., in the course of their business with Moss, delivered to the freight line at the request of Moss, one hundred and fifty-seven cotton-notes for cotton they had theretofore sold to Moss, and took the receipt of the freight line for the one hundred and fifty-seven cotton-notes. The thirty-nine cotton-notes in question in this suit, were among the lot of one hundred and fifty-seven thus called for on April 26th, and represented parts of different lots of cotton sold by Senter & Co. to Moss during January, 1880, when the bales were weighed, marked with the marks of Moss & Co., and replaced in the Cotton Compress Company's warehouse, where they remained until April 26th, when they were delivered to Mears. Between this date and May 1st, Moss was picking out cotton for shipment; and, finding that thirty-nine bales of a lot that he had pledged to the Fourth National Bank as collateral, would suit that shipment, he withdrew thirty-nine cotton-notes from Mears, and substituted them at the bank for thirty-nine cotton-notes it already held, and gave to Mears the notes he took from the bank. Exchanges of this character seem to be customary, and are used to enable shippers to make up assorted lots of cotton for shipment.

On May 1, 1880, Moss again failed, and left town owing Senter & Co. about $18,000. Senter & Co. held the receipt of the freight line for the one hundred and fifty-seven cotton-notes, and also something less than two hundred cotton-notes for cotton sold to Moss, not deliv-

ered to the freight line. After deducting the value of the bales for which Senter & Co. held the cotton-notes, about $10,000 was due to Senter & Co. by Moss for cotton purchased.

There is nothing to show that the Fourth National Bank had any notice of the arrangement between Moss and Mears, and between Moss and Senter. The bank took the cotton-notes in question for value, in the ordinary course of its business, and as collateral security for advances made by it to Moss. Senter & Co. claimed the thirty-nine bales, the cotton-notes representing which had been obtained by Moss from the freight line without their consent; and Senter & Co. having obtained possession by replevin, and restored these bales with the compress company, this action was begun by the bank.

Warehouse-receipts made payable to bearer, not transferred by indorsement, are not negotiable as mercantile paper; and the transfer of these cotton-notes gave the plaintiff no greater rights than it would have acquired by the transfer of the goods themselves. But the warehouse-receipt, or cotton-note, represented the cotton itself, and the pledge of the cotton-note was as effectual as a pledge of the cotton itself would have been. *St. Louis National Bank* v. *Ross*, 9 Mo. App. 399. Had Moss obtained the cotton-notes, or the cotton which they represented, by robbery or larceny, he could have passed no title, as against the real owner, to an innocent purchaser. But the doctrine is, that fraud practised by the vendee of a chattel, whereby he obtains the sale and delivery of it to himself, will not authorize the vendor to retake it from one who has subsequently purchased it for value without notice of the fraud. *Ditson* v. *Randall*, 33 Me. 202; *Hoffman* v. *Noble*, 6 Metc. 68. Goods pledged by a factor may also be recovered by the innocent pawnee. *St. Louis National Bank* v. *Ross*, 9 Mo. App. 399. In these cases, the owner is not divested by his own act of his right of property. But, in the case

at bar, the vendor seems to have made a sale; the goods sold were marked and set apart to the vendee, and the vendor delivered the warehouse-receipts made out in the vendor's name, to the transportation agent of the vendee. It is true that this was done on the faith of a statement of the vendee that this transportation agent would not issue bills of lading for the goods until certain receipts were delivered to him by the vendor, which receipts the vendor would not give up until the cotton was paid for; it is also true, that the transportation agent seems to have made such an arrangement with the vendee; but of all this the pledgee of these warehouse-receipts had no notice. The vendor, though desirous of retaining a lien, was deceived by the vendee into allowing the *indicia* of property and possession to pass into the hands of the vendee, in such a way as to enable the vendee to pledge the goods; and we see no principle upon which it can be held that the loss, which must fall somewhere, should fall upon the innocent pledgee, rather than upon the vendor who put it in the power of the pledgeor to hold himself out as the sole owner and alone entitled to the possession of these goods, under circumstances that must have deceived the most vigilant.

But, though the freight line of which Mears was the representative, was the transportation agent of Moss, the vendee of this cotton, it issued a receipt for these cotton-notes to the vendor, which sets out that the bill of lading for the cotton is to be issued only on the return of the receipt, and the bill of lading was issued and delivered to the vendee whilst the vendor, in fancied security, still held the receipt. If, by this arrangement, the vendor hoped to retain his lien after delivery of possession to the transportation agent, of these warehouse-receipts, which, for the purpose of this case, was a delivery of the cotton itself, his lien, at any rate, ought not to be allowed to prevail against innocent third parties. A sale and delivery of a chattel, so far as a *bona fide* purchaser from the first vendee is con-

cerned, without any notice of reserved claims or rights on the property, ought to be sufficient for his protection. The general rule, of course, is, that, where the vendor surrenders to the vendee, or to the agent of the vendee, the possession of the subject-matter of the sale, whether by a manual and actual, or by a symbolical, delivery, the lien is defeated, provided that the vendor does entirely and voluntarily resign possession of the goods. But there are cases in which the vendor, as between vendor and vendee, may retain a lien which he will not be entitled to as against interests of third persons which may intervene. By delivering the warehouse-receipts to the freight line, the vendor in the present case seems to have changed the control and dominion of the property, and he put it in the power of the vendee to do what he actually did, that is, to take the symbol of the property, which, so far as the rights of third persons are concerned, was the property itself, and to pledge it for value, under such circumstances as would naturally lead the most vigilant to believe that the property was his own to sell or pledge ; we do not see, therefore, how it can be said that, as to third persons, as the plaintiff in this case, the vendor retained his lien.

The case was submitted to the jury on the following instructions, of which those numbered from two to six were given at plaintiff's instance, and the rest at the instance of defendant : —

" 2. If the jury believe from the evidence that the cotton in question was part of a lot sold by Senter & Co. to Moss & Co. ; that after the terms of sale had been agreed upon, the cotton so sold was separated from the rest and weighed at the warehouse where it had been stored ; that the bales were then marked with the private marks of Moss & Co., and restored in the name and on account of Moss & Co., they agreeing to pay storage thereon ; that all these transactions took place with the knowledge and consent of Senter & Co. ; that thereafter Senter & Co. also delivered the ware-

house-receipts for said cotton, commonly called cotton-notes, to the transportation company which Moss & Co. had employed to attend to their transportation business, provided you find as a fact that Moss & Co. did so; that thereafter Moss & Co. withdrew the thirty-nine cotton-notes here in question from the transportation company, giving it thirty-nine others in place thereof, and then pledged the thirty-nine thus withdrawn with plaintiff for value and in the ordinary course of business, and that the debt on account of which they were pledged has not yet been paid, then the verdict must be for plaintiff, although the cotton may not have been paid for by Moss & Co., and notwithstanding the character of the receipt which the transportation company issued for said cotton-notes to Senter & Co., provided plaintiff had no actual notice of the terms of said receipt.

" 3. If the jury find from the evidence that the cotton in question was pledged by Moss & Co. to plaintiff for value, that plaintiff took said pledge in good faith without knowledge of any claim of Senter & Co., that the debt for the security of which the pledge was made has not been paid, that the cotton in question was sold by Senter & Co. to Moss & Co. prior to the time of said pledge, and was at the time of said pledge stored in warehouse in the name of Moss & Co. and marked with his marks; and if the jury further find from the evidence that by the habitual course of dealing between Senter & Co., Moss & Co., and the transportation agent, the conditions and stipulations of the printed transportation-receipts produced in evidence were disregarded, waived, and dispensed with, and that Senter & Co., either by themselves or their agents in charge of their business, consented to such course of business and allowed the transportation agent to deal with the cotton-notes as the property of Moss & Co., then the defendants cannot now claim any benefit or right under such conditional receipts as against this plaintiff, and the verdict should be for the plaintiff.

"4. If the jury believe from the evidence that W. C. Mears was the agent of Moss & Co. in the transactions involved in this case, and that Senter & Co. entrusted said Mears with the possession of the said cotton-notes in question, knowing him to be such agent, then plaintiff is not bound by any conditions or stipulations contained in the transportation-receipt taken from said Mears, unless plaintiff had notice or knowledge thereof when it received said cotton-notes. And if the jury find as above stated, and that plaintiff did not have such knowledge, and that plaintiff afterwards took said cotton-notes in good faith from Moss & Co. as a pledge for a debt which is still due, then the verdict must be for plaintiff.

"5. If the jury believe from the evidence that the cotton in question was paid for by Moss & Co. to Senter & Co., then the verdict must be for plaintiff, and the jury are further instructed, that in the absence of any specific agreement or direction to the contrary, payments made generally on account must be applied to the oldest item on the debt side of the account, as it stands when the payment is made.

"6. The court instructs the jury that Senter & Co. had no right of lien on the cotton-notes in controversy for so-called margins arising out of cotton transactions, other than the one involving the thirty-nine notes in controversy."

"The court instructs the jury that if they find from the evidence that Senter & Co. held the thirty-nine cotton-notes offered in evidence, and that Moss & Co. got possession of the same without the knowledge or consent of Senter & Co., and caused them to be delivered to plaintiffs, then plaintiffs did not acquire any right to said cotton-notes or the cotton represented by them, and the jury will therefore find for the defendants, provided they further find that Senter & Co. had not been paid for said cotton, and that, at the time Moss got possession of said

cotton, Senter & Co. held the same to secure payment for it.

"The court instructs the jury that if Mears was the agent of a freight line, and Senter & Co. delivered the cotton-notes for the cotton in controversy. to him and took a receipt from him in which he agreed to issue a bill of lading on return of the receipt, Senter & Co. then was not bound to make any inquiry to ascertain if it would violate the terms of said receipt or in any manner disregard the same.

"The court instructs the jury that if, under all the instructions given to you, you find that the right of possession of the cotton in controversy was in the defendants at the time it was placed in the plaintiffs' possession, then the fact that the same number of other cotton-notes were given to Moss & Co. in exchange for the thirty-nine notes then received by plaintiff, if such facts exist, would not in any manner affect defendant's right of recovery, unless such exchange was made by the consent of defendant."

These instructions, we think, put the case to the jury in a way of which appellant cannot complain.

It is claimed that there was no evidence to go to the jury that the stipulations of the printed transportation-receipts were disregarded, waived, and dispensed with, by the course of business between Senter & Co., and Moss, and the agent of the freight line, or that Senter & Co. consented to such a course of dealing. We think, however, that since there is evidence tending to show that the agreement between Moss and Mears was habitually violated for the period of eighteen months, that Senter & Co., in surrendering the receipts, seem to have been wholly careless of identity, provided that they had what they considered an equivalent in value on hand, and that they never instituted any inquiry as to how Moss, who was quite impecunious, raised the money to pay them, if he had neither the bill of

lading nor the cotton-notes, that it is an inference fairly to be drawn from these facts, and from all the facts in evidence, that defendants, at least, wilfully closed their eyes to what was going on between Mears and Moss. Whether Senter & Co. knew what the freight line was doing, and whether the course of business between Moss and Mears as to which these men say that there was no concealment, was carried on in such a way as to awaken no suspicion of wrong, were questions of fact for the jury.

It is claimed that instruction five, as to the application of payment, is erroneous. Where neither party appropriates the payment, the law will apply it; and we think the rule in such case is as stated, that payments made generally on account should be applied to the oldest item. It was open to appellant to ask a more definite and fuller instruction as to the application of payments, and we do not think that the judgment should be reversed for the giving of this instruction.

If we do not explicitly notice all the points made in the brief of counsel for appellant, it is not because they have not been considered, but because to do so would necessarily lengthen this opinion, and we feel that what has been said disposes of the merits of the case. The judgment upon the facts in evidence was for the right party; and it does not appear that anything occurred on the trial to the prejudice of appellants that will warrant a reversal of the judgment.

The judgment is affirmed. Judge LEWIS is absent; Judge THOMPSON concurs.