Berry v. Berry *et al.*

1. **Gift: PERFORMANCE OF CONDITIONS: ESTOPPEL.** To entitle a donee of personal property to claim that the gift is irrevocable, and invests him with the right to the property, it must be shown that he has complied with certain conditions upon which the gift was made.

2. —— The fact that an agent of the donor, or one having the possession of the property, delivered it without authority to the donee, he not being entitled thereto, not having performed the conditions imposed, would not bind the donor, nor would his mere failure to repudiate it estop him from afterward denying the right of the donee.

3. Detinue: **RIGHTS UNDER AGREEMENT.** An agreement on the part of a debtor to deliver as security to his creditor certain personal property will not enable the latter to maintain detinue therefor in case of its non-delivery.

*Appeal from Lucas Circuit Court.*

WEDNESDAY, APRIL 26.

ACTION in detinue for horses, harness, cows, hogs, plows, harrows, wagon, reaper, planter, stalk cutter, wheat, corn, etc., being the stock, utensils, and grain on a certain farm, owned by the defendant John Berry, and cultivated by the defendant James Berry. There was a jury trial, resulting in a verdict and judgment for the plaintiff. The defendants appeal.

*E. M. Thorpe* and *J. W. Wilkerson* for the appellant.

*Stuart Brothers* for the appellee.

COLE, J. — A concise statement of the main grounds of claim by the respective parties will conduce to brevity and

1. **GIFT:** performance of conditions: estoppel.

perspicuity in the disposition of the questions involved. The plaintiff is a son of the defendant John Berry, Sr., and a brother of the

defendant James. In 1865 they were all living in Ohio, and the defendant James was the owner of a tannery and stock. The plaintiff, Joseph, was a tanner; he was also more or less intemperate. James, with a partner, was merchandising, and the father purchased of him the tannery and stock at between $1200 and $1300, deposited with the firm $2,000 to be applied, first, in payment for the tannery, etc., and the balance to be advanced for the purchase of stock as Joseph should want and James should approve. Joseph was to have the entire profits of the tannery, etc., and if he kept sober and attended to his business the entire property, after three yerrs, was to be his by the gift of his father. All the money was invested in stock, etc., but Joseph did not keep sober or attend to his business, and remained there only about six months, and then voluntarily left, taking with him a team valued at about $400, his father agreeing thereto. James afterward sold the tannery, stock, etc., and used the proceeds. Within a year or so afterward. Joseph and James, with others of the family, came to Iowa, and James went on to a farm belonging to the father. The stock, utensils, etc., in controversy were procured and put on the farm by James, the father furnishing much of the means therefor. Joseph's habits continued about the same, and a part of the time he was on the farm working with James and received some money from him. In 1868, James became insane, and was taken to the asylum at Mount Pleasant. While he was there it was reported in the neighborhood of his residence that a judgment against him had been sent from Ohio for collection, and thereupon Joseph went to James' residence, and with the consent of James' wife executed and left with her a receipt for a part of the property in controversy, stating therein that he agreed to credit the value of it on the amount owing him by James. Joseph now claims in this action that the tannery, etc., was his property, and that the defendant James had converted it to his own use and was therefore

indebted to him for the amount of its value, which James had used in the purchase of the property in controversy, and had agreed to hold it as security for Joseph's debt. The defendants claim that the tannery never became the property of Joseph, but was the property of the father, and that the property in controversy had been turned over to the father as security for James' indebtedness to him and for rent.

The court instructed the jury "that if James invested the money, left with him by the father, in property, and placed it under the control of Joseph, in violation of the terms of the gift, and the said John Berry afterward acquired knowledge of the same, they will inquire whether he repudiated or set aside said investment, and if he did not he would be bound by the same, and could not dispute the plaintiff's right thereunder." And the court refused to give the following instruction asked by defendants, to-wit: "Plaintiff claims that John Berry gave to him as a gift a tannery, stock and money, amounting to $2,000, at Sayresville, Ohio; a gift to be binding and irrevocable must be completed by delivery to the donee by the giver or by his authority, without conditions; or, if conditions were imposed, that they were complied with by the donee."

It was alike error to give the first and to refuse the last. If the donee had knowledge of the terms of the gift, of course he could not acquire a title by receiving the property in violation of such terms. And even if he did not have knowledge of the terms of the gift (but about which there can be no controversy) and received the property from James, the agent, he could not acquire a better title than the agent was authorized to confer; and the donor, in either case, would not be bound by his simple failure to repudiate it. If the donee, in the belief that his title was good, had changed his situation and expended money or the like, then the donor might, by his failure to repudiate, be liable, like a grantor for value, to the application of the

doctrine of equitable estoppel. And, again, as to the instruction refused, it may be remarked, that it embodies a very plain and elementary principle, that a donee may not dictate the terms to, nor change those made by, the donor; he must take the gift with its conditions or not at all.

It is not necessary to review, seriatim, the twenty-three instructions given and the eighteen refused. Upon this branch of the case the court should have said, in substance, to the jury, that if they believed from the evidence that the tannery and stock were given by the father to Joseph upon the condition that he should keep sober and attend to his business, etc, or other condition which Joseph did not comply with; or that he afterward abandoned the gift to the donor or his agent, then he acquired no rights thereto or any part thereof which he could enforce in this action.

One ground of claim by the plaintiff is, that James agreed verbally to turn the property in controversy out to **3. DETINUE: rights under agreement.** him in security for what James owed him; but no possession of the property was taken, or act done under the agreement. This, without more, would not entitle the plaintiff to maintain detinue for the property so agreed to be turned out, and the court should have given the instruction to this effect, asked by defendants.

The jury found " that the defendants were indebted in the sum of $2,380, and that said plaintiff have and hold possession of the property in controversy (describing each item) until said debt be paid by defendants." There is not a word of proof or intimation anywhere in the record that the defendant John Berry ever owed the plaintiff one cent, even, and further, the proof shows, without conflict, that he purchased and paid for with his own money, and James had no claim whatever on, several of the articles the jury awarded to plaintiff. The verdicts, both general and special, were manifestly against the evidence

and should have been set aside. It is shown, also, by affidavits of some of the jurors, that at least two or three, or more of their number, drank intoxicating liquors during their deliberations. The judgment, in any event, must be

Reversed.