# Alabama State Bank *v.* Barnes.

## *Detinue for Bales of Cotton.*

1. *Warehouse receipt; delivery without indorsement, as collateral security.* In the absence of statutory regulations, the delivery of a warehouse receipt payable to bearer, as collateral security, without indorsement, passes the legal title, and vests the possession of the property in the pledgee, as if there had been an actual and manual delivery; and while, under statutory provisions, an indorsement is necessary to pass the legal title, in order to enable the transferree to maintain an action at law in his own name, and the holder for value of an indorsed receipt is protected against latent equities and rights (Code, § 2099; Sess. Acts 1880-81, p. 133), yet a transfer by delivery passes a special property and constructive possession, sufficient to create a valid pledge, as between the parties, and as against third persons who have not acquired prior or intervening rights.

2. *Same; receipt in favor of warehouse-man himself.*—A warehouse-man, having his own property stored in his warehouse, may issue a warehouse receipt for it, and pledge the property as collateral security for his own debt, by delivery without indorsement; and while such transfer is inoperative as against creditors and *bona fide* purchasers without notice, it is a valid transaction as between the parties, conferring rights which may be enforced.

3. *Writings construed together, as parts of one contract.*—Two or more separate writings, executed between the same parties, and as parts of the same transaction, will be construed together as one contract, and effect given to the intention of the parties as collected from the whole.

4. *Executory contract for pledge, or equitable mortgage.*—Where a banker advances money on the faith of cotton deposited in the borrower's own warehouse, taking his warehouse receipt payable to bearer, unindorsed, as collateral security; and it is stipulated in writing that he shall have a lien on the cotton, that it shall be kept in the warehouse by the borrower for his benefit, and that he may sell without notice on default; the cotton being set apart in the warehouse, tagged and numbered to

correspond with the receipt; although these facts do not show a perfected pledge, and do not pass the legal title to the banker. they yet show an executory contract of pledge, or an equitable mortgage; and the banker afterwards acquiring the legal title by an indorsement of the receipt, he has such a title as will support an action of detinue for the cotton, against any one who does not show a superior title.

5. *What title will support detinue.*—In detinue, or the statutory action for the recovery of personal property *in specie*, if the plaintiff has never had the actual possession of the property, he must show a valid and operatve legal title in himself at the commencement of the suit.

6. *Maintenance; transfer of personal property held adversely.*—The rule against maintenance forbids the transfer of personal property held adversely, so as to vest in the transferree the right to sue in his own name; but the rule does not apply, where the transferror has conveyed an equitable interest before the adverse possession commenced, and afterwards transfers the legal title to his assignée.

7. *Executory contract for pledge.*—An oral contract between bankers and one of their customers, who was engaged in the business of buying cotton, by which it is stipulated that the cotton bought, and paid for by checks on them, shall be their property, and that they shall have the right to take, hold, and sell the same, until the money advanced for the purchase is repaid, does not create either a mortgage or a pledge of any particular cotton bought by the customer, until the cotton has been delivered, or specifically appropriated to that particular purpose.

8. *Possession wrongfully taken under equitable lien.*—Possession wrongfully taken, by a person who has an equitable lien on personal property, can not defeat an action by the holder of a prior or superior equitable lien, who acquires the legal title after such wrongful taking.

APPEAL from the Circuit Court of Greene.

Tried before the Hon. S. H. SPROTT.

This action was brought by the Alabama State Bank, a corporation doing business at Birmingham, against B. B. Barnes and others, who were engaged in business as partners under the name of the Bank of Eutaw, to recover one hundred bales of cotton; and was commenced on the 13th August, 1884. The cotton had belonged to Cleage Brothers, a partnership engaged in business at Eutaw and other places, under whom each of the parties claimed title; and it had been stored by them in their warehouse at Eutaw. The plaintiff claimed the cotton under a written agreement with the said Cleage Brothers, which was dated at Birmingham, April 30th, 1884, signed by them, and in these words: "The Alabama State Bank having this day loaned us $11,385.91, on 230 bales of cotton, now stored in warehouses at Tuskaloosa and Eutaw, which will average," &c., specifying quantity and quality, "we agree to keep said cotton covered by insurance in good, solvent companies, the loss (if any) payable to said bank, and also, on the demand of the said bank, and within forty-eight hours after notice sent to us by mail or telegraph, to pay them such additional sum as they may deem necessary to cover any decline in the price of cotton. Should we fail to keep and perform

promptly any agreement herein at maturity, or fail to pay said loan at maturity, said bank, or its agents, may sell said cotton in such manner as they deem best, and without notice, and apply the proceeds, after paying all expenses, costs and charges incurred by them, or lawfully claimed against said cotton, to the payment of said note. Witness our hands," &c. Of the cotton mentioned in this agreement, the portion here in controversy (100 bales) was at that time stored, with other bales, in the McGee warehouse at Eutaw, of which said Cleage Brothers were the lessees; and they had obtained an advance or loan of $3,000 on it from the National Bank of Birmingham, a warehouse receipt, unindorsed, being deposited as collateral security, which receipt is copied in the opinion of the court. By the agreement between plaintiff and Cleage Brothers, but not specified in the writings, plaintiff advanced to the National Bank at Birmingham the amount due to it from Cleage Brothers, and received from it, without indorsement, the warehouse receipt given by Cleage Brothers. This receipt was indorsed by Cleage Brothers to the plaintiff, a short time before the commencement of this suit, but after the defendants had taken possession of the cotton, against the protest and objection of Cleage Brothers, who had removed it from their warehouse, and while it was on the platform at the railroad depot in Eutaw. This was the plaintiff's title.

It was shown, also, that the plaintiff's loan to Cleage Brothers was made at the rate of one per cent. per month interest, and that while the negotiations for the loan between the parties were pending, and before agreeing to make the loan, the plaintiff addressed letters to B. B. Barnes, one of the defendants, as cashier of the Bank of Eutaw, and also to its correspondent at Tuskaloosa, making inquiries as to the financial condition of Cleage Brothers and the warehouse. The reply of said Barnes, which was dated May 1st, 1884, was in these words: "We have been supplying Cleage Brothers with money to purchase cotton, for two seasons. They have had our confidence, and have always given satisfaction. I am told by one of their firm that they have been very successful this season—have made about 10 m. One of our warehouses is owned by a man in North-port, Alabama, who is considered responsible; and the other is owned by F. G. Stickney, of this place, who is worth about 3 m." It was shown, also, that the cotton was bought by Cleage Brothers during the business season of 1883-4, and was paid for by checks drawn by them on the said Bank of Eutaw. The defendants claimed the cotton

39

under two verbal agreements between themselves and said Cleage Brothers, one made in August, 1883, and the other in May, 1884. The substance of each of these agreements is stated in the opinion of the court. The plaintiff adduced evidence tending to disprove the existence of the latter agreement. It was shown, also, that Cleage Brothers sold twenty-four out of the one hundred bales which were at first covered by the warehouse receipt, and substituted twenty-four other bales, which were marked *S. R. W.*; and these latter bales, called the "S. R. W. cotton," were included in the cotton sued for.

The court gave the following charges to the jury, on the written request of the defendants :

"1. If Cleage Brothers took out twenty-four bales from the lot of cotton pledged to plaintiff, and substituted twenty-four other bales, marked *S. R. W.;* and if said S. R. W. cotton was included in a bill of lading which they had obtained from a railroad company, and pledged to a bank in Chattanooga ; and if the Bank of Eutaw afterwards paid the Chattanooga bank the amount due it, for which they held said bill of lading, in pursuance of an agreement with Cleage Brothers, and in faith of said cotton ; then the Bank of Eutaw is entitled to hold said S. R. W. cotton."

"3. If defendants and Cleage Brothers met about May 23d, 1884, and made an estimate of all the cotton then on hand in Greene county, purchased by Cleage Brothers, and paid for by defendants on the checks of Cleage Brothers, including the cotton now in controversy, and estimated also the amount of defendants' account against Cleage Brothers ; and if it was then agreed between them that defendants would pay to a bank in Chattanooga, and charge to Cleage Brothers, $5,000 for the re-purchase or redemption of a bill of lading which Cleage Brothers had, without defendants' knowledge, obtained from the railroad company, for the shipment of one hundred bales of said cotton, and had negotiated to said bank in Chattanooga, and then held by said bank for a loan to Cleage Brothers ; and if it was then agreed between them, also, that defendants should hold all of said cotton until the 15th June following, and, if not then shipped out by Cleage Brothers, defendants should take, ship and sell the same, and apply the proceeds to the payment of the indebtedness of said Cleage Brothers to said bank, including the $5,000 to be paid to said bank in Chattanooga ; and if defendants did, a few days thereafter, in pursuance of said agreement, pay said $5,000 to said bank in Chattanooga, and charge the same to Cleage Brothers, and said bill of lading was returned and cancelled, and

defendants held said cotton as agreed on; and if all this occurred without any notice to the defendants of the plaintiff's claim to the cotton in controversy; then, these facts authorized the defendants to take peaceable possession of the cotton after the 15th June, even though forbidden or objected to by Cleage Brothers, or their agent, at the time of the taking, provided no violence or breach of the peace was committed or threatened; and the defendants can hold the cotton, under that possession, against the claim of plaintiff in this suit; and the correspondence between plaintiff and said Barnes, cashier, can not affect these subsequent transactions."

"4. The delivery of the warehouse receipt signed by Deadrick, by Cleage Brothers to plaintiff, unindorsed, did not pass to plaintiff any legal title to the cotton; and the other agreement cotemporaneously delivered by them to plaintiff, for said loan, did not, either by itself, or in connection with said warehouse receipt, nor both together, pass the legal title to the cotton, so as to authorize plaintiff to maintain this suit; and the subsequent indorsement of the warehouse receipt by Cleage Brothers, after defendants had actual adverse possession of the cotton under claim of ownership, and after Cleage Brothers and plaintiff both knew that defendants had actual adverse possession of the cotton, if such be the facts, would not pass any title to plaintiff, upon which this suit can be maintained."

"6. If it was agreed between Cleage Brothers and defendants, in August, 1883, that the defendants would pay for cotton purchased by Cleage Brothers during the ensuing cotton season, by paying the checks of said Cleage Brothers on them for the price of the cotton as bought by them, and that, in consideration thereof, the cotton so purchased and paid for should be the property of defendants, and subject to their right to possess, control, ship or sell the same, whenever necessary, until all advances made by them in the purchase of cotton should be paid; then, each bale of cotton so purchased by Cleage Brothers, and paid for by the bank upon their checks, became, as purchased and paid for, the property of the defendants for the purposes aforesaid; and if the cotton in controversy was so purchased and paid for, then the same became, as purchased, the property of the defendants for the purposes aforesaid."

"7. If plaintiff's claim upon the cotton was acquired as security for a loan at a rate of interest of one per cent. per month, then plaintiff was not a *bona fide* purchaser of the cotton, as against any prior title to the same of the Bank of

Eutaw, if, from the evidence, they find that said bank did have such prior title."

"8. If the jury find, from the evidence, that when Deaderick executed the warehouse receipt, he was the mere clerk or agent of Cleage Brothers, and said warehouse was in their possession and control as their own ; and that the cotton remained in the possession of Cleage Brothers until the Bank of Eutaw took actual possession of the same, in July, 1884 ; then, the delivery of said receipt, unindorsed, by Cleage Brothers to plaintiff, did not operate to pass the possession or title of said cotton to plaintiff, so as to affect the title of a subsequent *bona fide* purchaser from Cleage Brothers."

" 9. If the agreement between Cleage Brothers and the Bank of Eutaw, on or about May 23d, 1884, was, that said bank should pay the bank in Chattanooga $5,000, to re-purchase and redeem the bill of lading obtained by Cleage Brothers on one hundred bales of the cotton then on hand, purchased by Cleage Brothers, which bill of lading had been negotiated with the bank in Chattanooga, and that the Bank of Eutaw should hold all the cotton (including the cotton now in controversy) until June 15th following, and that, if the same should not be then shipped out by Cleage Brothers, said Bank of Eutaw should take, ship and sell the same, and apply the proceeds to the account of Cleage Brothers ; and if the Bank of Eutaw did pay the $5,000 in pursuance of said agreement, and Cleage Brothers did not ship out the cotton in controversy on June 15th ; then the effect of the agreement was such as to give said bank a legal title to the cotton, and authorized it to take peaceable possession of the same; and if all this was done without any notice to said bank of plaintiff's claim to said cotton, then said title and possession are sufficient to defend this action."

These charges, to each of which the plaintiff duly excepted, are now assigned as error.

. Jas. E. Webb, for appellant.—(1.) The plaintiff, as pledgee, had such a title as would support an action of detinue. Story on Bailments, § 303 ; Jones on Pledges, § 429, and cases cited ; *Noles v. Marable*, 50 Ala. 369 ; 2 Parsons' Contracts, 110 ; 1 Chitty's Pl. 122. A legal title to the cotton was not necessary, when the plaintiff had a legal right to the possession, and had such possession as the subject-matter was susceptible of.— *Wortham v. Gurley*, 75 Ala. 361 ; *Huddleston v. Huey*, 73 Ala. 215. (2.) A warehouse-man, having cotton in his own warehouse, may give a warehouse receipt for it, and thereby create a valid pledge.—Colebrook

[Alabama State Bank v. Barnes.]

on Collateral Securities, § 420 ; *Merchants' Bank v. Hibbard*, 48 Mich. 118 ; *Broadwell v. Howard*, 77 Ill. 307 ; *Gibson v. Stevens*, 8 How. 399 ; *Shepardson v. Cary*, 29 Wisc. 41; *Rice v. Cutler*, 17 Wisc. 351 ; Jones on Pledges, §§ 325-6.   (3.) A transfer of such warehouse receipt by delivery only effectuates the pledge, and is a symbolical delivery of the cotton, though an indorsement may be necessary to pass the legal title to the cotton itself.—Jones on Pledges, § 263 ; *Holmes v. Bank*, 87 Penn. St. 525 ; *Holmes v. Bailey*, 92 Penn. St. 57. (4.) The defendants can not be regarded as *bona fide* purchasers of the cotton, because they are estopped from asserting any right based on the fact that Cleage Brothers were the lessees and keepers of the McGee warehouse, since their letters, in reply to inquiries, induced plaintiff to loan them $5,000 on the faith of the cotton stored in that warehouse.—Bigelow on Estoppel, 560.   (5.) Nor can they be regarded as *bona fide* purchasers, because their loan (or advance) to Cleage Brothers was.tainted with usury, that being the legal effect of the $500 bonus paid to B. B. Barnes. *Davis v. Garr*, 55 Amer. Dec. 395 ; *Payne v. Newcomb*, 39 Amer. Rep. 69 ; *O'Neal v. Cleveland*, 30 N. J. Eq. 274 ; *Austin v. Harrington*, 28 Vt. 130.

J. B. HEAD, *contra.*—(1.) By statutory provision, a warehouse receipt can only be assigned by indorsement.—Code, § 2099 ; *Allen, Bethune & Co. v. Maury*, 66 Ala. 18 ; *Lehman, Durr & Co. v. Marshall*, 47 Ala. 362 ; *Henley v. Bush*, 33 Ala. 642.   (2.) Delivery of possession is necessary to constitute a valid pledge ; and therefore a receipt given by a warehouseman for his own cotton, though it may operate as an equitable mortgage, does not create a pledge, nor pass any title to the property.—*Sims v. Canfield*, 2 Ala. 555; Jones on Pledges, § 324, and authorities cited.   (3.) To maintain detinue, when the plaintiff has never had the actual possession, he must prove a legal title in himself.—*Reese v. Harris*, 27 Ala. 301 ; *Jackson v. Rutherford*, 73 Ala. 155 ; *Russell v. Walker*, 73 Ala. 301.   (4.) There is nothing in the terms of the correspondence between the parties, or in the attendant circumstances, to create an estoppel against the defendants.   Their replies to inquiries were strictly true, and as full as the questions demanded ; and if any further information was desired, it should have been asked.— *Ware v. Cowles*, 24 Ala. 449 ; *Miller v. Hampton*, 37 Ala. 346.   (5.) But estoppel *in pais* is an equitable doctrine, and it can not be invoked by a *mala fide* purchaser ; and that is the position of the plaintiff, by reason of the usury charged in the loan to Cleage.—*Saltmarsh v. Tuthill*, 13 Ala. 390 ; *Carlisle*

*v. Hill*, 16 Ala. 398 ; *Wailes v. Couch*, 75 Ala. 134; *McCall v. Rogers*, 76 Ala. 349. (6.) The agreement under which defendants advanced the money to buy the cotton—that they should hold it until June 15th, and, if not then shipped out by Cleage, should take and ship it themselves—conferred a legal title, and authorized them to take peaceable possession of the cotton.— *Carroll v. Pathkiller*, 3 Porter, 279 ; *Burns v. Camp'ell*, 71 Ala. 271 ; *Street v. Sinclair*, 71 Ala. 110. (7.) The bonus paid to B. B. Barnes was outside of the partnership business, and did not infect their transactions with Cleage with the taint of usury.—Story's Part. § 110 ; Tyler on Usury, 156 : 8 Humph. (Tenn.) 415.

CLOPTON, J.—Whether the appellant, who brought the suit, has title or property in the cotton in controversy, sufficient to maintain an action of detinue, depends on the legal effect of the following facts : Cleage Brothers were lessees of a warehouse at Eutaw, known as the McGee warehouse, in which they stored cotton bought by themselves, and also the cotton of other persons. As collateral security for money borrowed from the National Bank of Birmingham, in February, 1884, they deposited with the bank, without indorsement, a receipt for one hundred bales of cotton, designated therein by numbers. The receipt is as follows : "*Received, Eutaw, Ala., February* 2d, 1884, *at the McGee warehouse, in good order, from Cleage Bros.,* 100 *bales of cotton, which we promise to deliver to him, or bearer, on paying customary charges (loss by fire excepted).*" The receipt was signed by J. W. Deadrick, who was in fact their clerk, without any indication that he issued it as clerk, or agent, or in any other that his individual capacity. In May following, Cleage Bros. borrowed from the plaintiff over eleven thousand dollars, and executed a written instrument, by which, after reciting that the money was loaned on two hundred and thirty bales of cotton stored in warehouses at Tuskaloosa and Eutaw, of certain quality and weight, they agreed to keep the cotton insured, loss if any payable to plaintiff, and to pay, on demand and after notice, such additional sum as plaintiff might deem necessary to cover any decline in the price of cotton ; and on default in the performance of the agreement, or in paying the loan at maturity, plaintiff was authorized to sell the cotton without notice, and to apply the proceeds, after deducting expenses, to the payment of the loan. It was also agreed, that out of the money loaned, the plaintiff should pay the National Bank of Birmingham, and take up and hold the receipt, deposited with that bank, as col-

lateral security for the money loaned, the cotton included in the receipt representing the cotton mentioned in the written instrument as stored at Eutaw; which was done. At the time of the transaction, and until shortly before the commencement of the suit, plaintiff was not informed that Cleage Bros. were the lessees of the warehouse, or had any connection with it as proprietors, or that Deadrick was not the warehouse-man. Soon after the receipt was deposited with the National Bank, Cleage Bros. caused one hundred bales of cotton to be marked with tags, numbered to correspond with the numbers in the receipt, and set apart from the other cotton in the warehouse belonging to them. The cotton so tagged and marked remained in the warehouse, separated from the other cotton, until about June, 1884, when it was removed by Cleage Bros., without the knowledge or consent of plaintiff, to the platform of the depot of the railroad company at Eutaw, where it remained, except twenty-four bales which were sold by Cleage Bros., others being substituted, until possession thereof was taken by defendants. Cleage Bros. indorsed the receipt to plaintiff, after defendants had taken possession as hereinafter stated, but before the commencement of the suit.

The general rule, independent of statutory regulations, is conceded, that the delivery, without indorsement, of a warehouse receipt payable to bearer, as collateral security, passes the legal title, and vests possession of the property in the pledgee, equivalent to its actual and manual delivery. But it is insisted that the transfer of such receipts is regulated by the statutes, and that indorsement is requisite, not only to convey the title, but also to confer a special property, and to operate a constructive delivery of possession. Section 2099 of the Code provides : "All bonds, contracts, and writings for the payment of money, or other thing, or the performance of any act or duty, are assignable by indorsement, so as to authorize an action thereon by each successive indorsee." Under this section, as construed by our decisions, an indorsement of a warehouse receipt, though payable to bearer, is necessary to convey the legal title.—*Allen v. Maury*, 66 Ala. 10 ; *Lehman, Durr & Co. v. Marshall*, 47 Ala. 362. The section is enabling, and was specially designed to provide the mode, in respect to such documents, of passing the legal title, so as to enable the real owner to prosecute an action thereon in his own name. So far as it relates to the passing of title by the delivery of warehouse receipts and similar documents, the statute is an innovation on the mercantile law, and will not be construed as abrogating or modifying it, further than is expressed, or

[[Alabama State Bank v. Barnes.]

is absolutely required to effectuate the purposes. By section six of the act of February 28, 1881, being the other statute relied on, warehouse receipts, given for cotton stored or deposited, *may* be transferred by indorsement; and any person, to whom the same may be so transferred, shall be deemed and taken to be the owner of the property, so far as to give validity to any pledge, lien, or transfer, made or created by such person; and no cotton shall be delivered except on surrender and cancellation of the original receipt, or the indorsement thereon of the delivery, in case of a partial delivery.—Acts 1880-1, 133. This statute does not imperatively require indorsement. The intention is to protect the warehouse-man against a mistaken or wrongful delivery, and to protect the holder for value of such *indorsed* receipts, against latent equities and rights. The statute, being permissive, does not prevent the passing of title, and delivering possession, in any mode previously effectual.—*Rice v. Cutler*, 17 Wis. 351; Jones on Pledges, § 301. Notwithstanding section 2099 requires indorsement to convey the *legal* title, neither statute operates to prevent the transfer of a special property and constructive possession by the delivery of the receipt without indorsement, sufficient to create a valid pledge, as between the parties, and as to third persons not having acquired prior or intervening rights. —*Fourth Nat. Bank v. St. Louis Cot. Comp. Co.*, 11 Mo. App. 333; *St. Louis Nat. Bank v. Ross*, 9 Mo. App. 399.

It may be regarded as now settled, that a warehouse-man, having property of his own stored in his warehouse, may, in the absence of statutory enactments, issue receipts therefor, and pledge the property as collateral security for his own debt, by the delivery of such receipts.—*Mer. & Man. Bank v. Hibbard*, 48 Mich. 118; *Cochran v. Ripley*, 13 Bush, 495; *Parshall v. Eggert*, 54 N. Y. 18. Section two of the act of February 28, 1881, is declaratory of the general rule. It provides that no warehouse-man shall issue any receipt upon any goods, cotton, or other produce, to any person, as security for money loaned, or other indebtedness, unless such goods, cotton, or other produce is in his custody, and in store, or on the premises, and under his control, at the time of issuing such receipt. It may be a question, whether such receipts, in order to operate a transfer of the right of property and possession, should not be made directly in the name of the person to whom transferred; and it may be said, the receipt delivered to the plaintiff, having been signed by the clerk of Cleage Bros., and issued in their name, though payable to their order or bearer, does not

[Alabama State Bank v. Barnes.]

come within the rule. In *De Wolf v. Gardner*, 12 Cush. 19, the plaintiff executed a duplicate warehouse receipt in his own name, for a large number of barrels of flour, acknowledging that he had received the flour in store, branded and marked, which he agreed to hold subject to the order of Gibson, and to ship the same by the first opportunity, consigned to him, with condition that the receipt should remain attached to a certificate referring to the property. The receipt and certificate were attached to a draft drawn on the consignee, as evidence of a lien on the property in favor of the holders of the draft, but reserving to the consignee the right to sell, and hold the proceeds in trust for the holders of the draft. The consignee wrongfully pledged the property, while *in transitu*, for his own debt, and the plaintiff brought trover against the pledgee. It was held, that the plaintiff had so far parted with the right of property and of possession, and the same had so far vested in the holders of the draft, for security of which he had pledged the flour, that he could not maintain the action. In this case, however, actual possession was delivered to the consignee, which was considered as the possession of the holders of the draft. The question is not without difficulty, when possession is retained by the warehouse-man. Evidently the transfer is invalid and inoperative as to creditors and *bona fide* purchasers without notice ; but, as between the parties, the delivery of such receipt to a third person, for value, is an issue of the receipt, and a valid transaction, conferring rights.

But the nature and character of the title and rights of the plaintiff are not to be determined from the receipt alone. The written agreement and the receipt are parts of one transaction, and should be construed together, and the intent of the parties collected from both instruments, to which effect should be given. The written agreement declares a lien, with a stipulation, that Cleage Bros. shall keep the cotton insured for the security of plaintiffs, and confers power to sell without notice on default. The receipt acknowledges that the cotton is in store, subject to be delivered to the bearer; and separating and setting apart one hundred bales of cotton, marked and numbered to correspond with the receipt, was an appropriation of the specific cotton to the lien. The manifest intent was, to create a lien on the specific cotton, and to transfer the right of property ; but the warehouse-men were to retain the actual possession until default, and hold it for the benefit of plaintiff, and as security for the money loaned. Though it may be regarded as now settled, that the pledgor himself may be the agent to keep and hold possession of the pledge, we do not con-

sider the transfer of possession sufficient, under the terms of the written instruments, to constitute a strict and perfected pledge; but the co-operative effect is an equitable assignment of the cotton for the purpose intended, creating an executory pledge contract, or an equitable mortgage.

Under the statute, the delivery of the receipt unindorsed did not convey the legal title, and the agreement does not purport to convey it. Not having had actual possession, it is true that the plaintiff can not maintain the action, without having a valid and operative legal title at the commencement of the suit.—*Reese v. Harris*, 27 Ala. 301. This brings for consideration the effect of the indorsement of the receipt after defendants had taken possession of the cotton, having reference to which we have considered the nature and character of the transaction as between plaintiff and Cleage Bros. Defendants insist that it is invalid and inoperative, on the ground that they were in adverse possession under claim of ownership at the time the indorsement was made. Unquestionably, the general rule is, that personal property held adversely in independent right, can not be sold and conveyed by the true owner, so as to vest in the purchaser the right to sue thereon in his own name. The rule is intended to prevent *maintenance*, and, on the theory that its evils are involved, prohibits the transfer of property thus held adversely. In *Williamson v. Sammons*, 34 Ala. 691, it was held, that where the plaintiff sold personal property, either with an express or implied warranty of title, and after the sale the defendant took possession of the property, and held it under a *bona fide* claim of title, a transfer back by the purchaser to the seller is not void, though made upon a rescission of the contract of purchase pending the adverse possession. The principle of the decision is, that the offense of maintenance is not involved, when a vendor who has warranted the title, assists the suit of his vendee involving that title. In *Jackson v. Bull*, 1 Johns. Cases, 81, KENT, J., adopts as a just rule of construction, "that whenever it is intended to be shown that nothing passed by a grant, by reason that at the time there was possession in another adverse to the grantor, then the time to which the grant is to relate, is the time when the bargain for the sale was finally concluded between the parties, and that, consequently, any intermediate adverse possession before the execution of the conveyance (which is only the technical consummation or evidence of the grant), can never affect it."—*Hale v. Darter*, 10 Humph. 92 ; *West v. Drawhorn*, 65 Amer. Dec. 614.

We have shown that the transaction between the parties

was an equitable assignment of the cotton as security for the money loaned, and constituted an executory pledge contract, or equitable mortgage. Default in paying the loan at maturity had occurred prior to the time defendant took possession, and plaintiff, under the agreement, had the right to immediate possession. Only the indorsement of the receipt was wanting to convert the equitable into a legal title, or to perfect the pledge, making it effectual as security according to the mutual intent and understanding of the parties. Cleage Bros. had a direct interest in the litigation involving its sufficiency and validity, and, having such interest, are not guilty of maintenance in assisting to uphold it. The indorsement related back to the time when the contract was finally concluded, and the intermediate adverse possession of the defendants does not affect its validity or operation. But the ratification, pending the adverse possession of defendants, does not relate back so as to bring the twenty-four bales substituted within the operation of the indorsement. To these the plaintiff has not the legal title, and never had actual possession, and hence is not entitled to recover them in this action.

If there was a parol agreement in August, 1883, that defendants would pay the checks of Cleage Bros. drawn for cotton purchased by them during the ensuing season, and that the cotton so purchased and paid for should be the property of defendants, and that they should have the right to take, hold, ship, and sell until all advances made in the purchase of the cotton should be paid, neither a mortgage on specific property, without a particular appropriation, nor a pledge without delivery of possession, was created. The title to the cotton subsequently purchased by Cleage Bros. in *their own name* did not, *eo instanti* on its purchase, pass to the defendants, and a lien on any particular cotton did not arise; and a pledge of future property does not become effectual until the property comes into existence, and possession, actual or constructive, is delivered to the pledgee. Such agreement can not have any operation other than a contract to execute a mortgage or pledge. *Burns v. Campbell*, 71 Ala. 271.

Defendants further set up, that the detention is not wrongful, by reason of having possession taken under an alleged parol agreement made about May 23, 1884. The agreement is substantially as follows: The defendants were to pay a note of Cleage Bros. for five thousand dollars, held by a bank in Chattanooga, as security for which Cleage Bros. had delivered a bill of lading for one hundred bales of cotton, and take up and cancel the bill of lading; and,

in consideration thereof, Cleage Bros. agreed that defendants should hold all the cotton then on hand, to pay for which defendants had advanced the money, until June 15, 1884, the quantity of which was estimated, and if not then shipped or sold by Cleage Bros., the defendants should have the right and authority to take, ship, and sell the same, and apply the proceeds to the payment of Cleage Bros.' indebtedness to them, the amount of which was computed, including the amount paid the bank in Chattanooga. The amount was paid as agreed on, and the bill of lading taken up and cancelled. This agreement was prior to the passage of the statute declaring mortgages on personal property invalid unless in writing and subscribed by the mortgagor. In July thereafter, the defendants took possession of the cotton in controversy, without the consent, and against the objection of Cleage Bros.

The agreement manifestly implies, that Cleage Bros. were to retain the possession of the cotton, with the privilege to ship and sell, without stipulation as to the disposition of the proceeds. Such parol agreement may be regarded as an agreement for a lien or charge, created for the purpose of securing the indebtedness, such as may exist without the delivery of the property—an equitable lien. Such lien, without possession acquired under it, will not support an action of detinue, and does not constitute a valid defense, when the plaintiff has the legal title.—*Jackson v. Rutherford*, 73 Ala. 155. The defendants, however, insist that their possession, taken under the authority conferred by the agreement, joined to their equitable title, acquits the detention of wrongfulness. That the owner of personal property, wrongfully withheld, may take possession, when he can do so without violence or force, or a breach of the peace, may be regarded as settled by our former decisions ; and on this rule, a mortgagee may, in like manner, take possession after the law-day of the mortgage, the title to the property vesting in him absolutely at law, leaving nothing in the mortgagor but an equity of redemption.—*Street v. Sinclair*, 71 Ala. 110. The rule is subject to the limitation, that possession can not be lawfully taken against the objection of the party in possession, unless the other party has title to, or ownership of the property, which will support an action for its recovery.—*Huddleston v. Huey*, 73 Ala. 216. The verbal agreement did not entitle the defendants to maintain detinue for the cotton.—*Berry v. Berry*, 31 Iowa, 416.

The defendants, having only an equitable right or interest, could not, by taking possession against the objection of

[Alabama State Bank v. Barnes.]

Cleage Bros., strengthen their equitable title, so as to create a valid defense to the present action. Whatever may be the character and effect of the agreement as between Cleage Bros. and defendants, the rights of the plaintiff necessarily enter as qualifying elements of consideration. The plaintiff, by the contract of May 2, 1884, was vested with the right to possession on default in paying the money loaned at maturity, and was entitled to possession at the time defendants took the cotton. Cleage Bros. were holding the cotton in trust, and for the benefit of plaintiff. They were estopped to deny plaintiff's right of possession; because such denial is inconsistent with the relation they occupied. By taking possession against objection of Cleage Bros., the defendants' possession thus wrongfully obtained is subordinated and subject to the right of plaintiff—they do not occupy the vantage-ground of *bona fide* purchasers. No rights arise by reason of an unlawful possession, except against a wrongdoer. Moreover, at the time possession of the cotton was taken, both plaintiff and defendants had only equitable claims or interests, plaintiff's being prior in point of time; and possession taken under such circumstances, wrongful as against plaintiffs, though supported by an equitable lien, will not prevail in an action at law against the legal title acquired by plaintiff. Not merely possession, but also the right of possession, accompanied by a lien for the money advanced, is essential to a valid defense, the plaintiff having the legal title.

We do not wish to be understood as deciding that defendants obtained no lien, which may be superior to that of the plaintiff, or that the indorsement of the warehouse receipt relates back, so as to cut off such lien, if acquired *bona fide* without notice of the plaintiff's rights. This question is not before us. All we do decide is, that, under the circumstances, the possession was unlawfully taken, and that an equitable lien, resting on a wrongful possession, though taken without notice of the plaintiff's rights, is not sufficient to override the legal title, in an action of detinue, whatever would have been its effect, if the possession had been surrendered to the defendants by Cleage Bros. for the purpose of carrying the parol agreement into effect. If they have a superior lien, they must resort to a court of equity for its enforcement.

The plaintiff's rights having been acquired prior to the acquisition of rights by the defendants, no question of usury arises in the case; and the question of estoppel is not raised by the record.

It is unnecessary to refer specially to the several charges

given, as an application to the principles above stated will readily show which are erroneous.

Reversed and remanded.