[Bank of Eutaw (Barnes) v. Alabama State Bank.]

# Bank of Eutaw (Barnes) *v.* Alabama State Bank.

*Statutory Detinue for One Hundred Bales of Cotton.*

1. *Mortgage of property to be afterwards acquired; executory contract of pledge.*—A verbal agreement between private bankers and one of their customers who was engaged in the business of buying cotton, to the effect that they would advance money to be used by him in the purchase of cotton; that all cotton bought by him, and paid for by checks on them, should be their property, and they should have the right to take, hold and sell the same, until the money advanced for it had been repaid; and that on their failure to sell, the customer might ship and sell the cotton, but should give them a draft for the proceeds, with bill of lading attached,—does not create a legal mortgage, nor operate as a pledge of any particular cotton, until it has been delivered, or otherwise specifically appropriated.

2. *Same.*—A subsequent agreement between the parties, after other transactions between them, to the effect that the bankers, on paying a note held by another bank, should take up and cancel a bill of lading for one hundred bales of cotton, held by that bank as security for the debt, and should hold all the customer's cotton then on hand, which he had bought with money advanced by them, until a specified future day, and, if not sold or shipped by the customer before that day, should have the right to take possession, ship and sell it, applying the proceeds of sale to the payment of the customer's indebtedness to them,—like the previous agreement, creates only an equitable lien, which, coupled with possession wrongfully taken, can not defeat an action by the owner of a superior equitable lien, who procured the legal title by an indorsement of the warehouse receipts after such wrongful possession taken.

3. *Equitable lien with possession, as against prior lien with subsequent legal title.*—While possession of personal property wrongfully taken by a person who has an equitable lien on it, can not prevail against a prior or superior equitable lien, coupled with a legal title acquired after the wrongful taking; yet the title of the latter does not attach, as against the former, to property which was substituted by the owner, under whom each party claims, for a part of the property covered by the lien which he had disposed of.

FROM the Circuit Court of Greene.

Tried before the Hon. SAM. H. SPROTT.

This action was brought by the Alabama State Bank, a corporation doing business at Birmingham, against the Bank of Eutaw, a partnership composed of B. B. Barnes and others, who conducted business as bankers at Eutaw, to recover one hundred bales of cotton; and was commenced on the 13th August, 1884. The cotton had belonged to Cleage Brothers, a partnership engaged in the business of buying cotton,

during the years 1883–4, in Eutaw and other places; and each of the parties claimed title under them. The plaintiff claimed it under a contract which originated in an application by Cleage Brothers for a loan of money, and which, as reduced to writing and signed by them, was dated at Birmingham, April 30th, 1884, and in these words: "The Alabama State bank having this day loaned us $11,385.91, on 230 bales of cotton, now stored in warehouses at Tuskaloosa and Eutaw," specifying weight and quality; "we agree to keep said cotton covered by insurance in good, solvent companies, the loss (if any) payable to said bank, and also, on the demand of the said bank, and within forty-eight hours after notice sent to us by mail or telegraph, to pay them such additional sum as they may deem necessary to cover any decline in the price of cotton. Should we fail to keep and perform promptly any agreement herein at maturity, or fail to pay said loan at maturity, said bank, or its agents, may sell said cotton in such manner as they deem best, and without notice, and apply the proceeds, after paying all expenses, costs and charges incurred by them, or lawfully claimed against said cotton, to the payment of said note."

Of said 230 bales of cotton, 130 were stored in a warehouse in Tuskaloosa, and 100 in the "McGee Warehouse" at Eutaw, of which Cleage Brothers were the lessees; and a warehouse receipt for these 100 bales was then held by the National Bank of Birmingham, as security for a loan or advance of $3,000. By the terms of the agreement between plaintiff and Cleage Brothers, though not expressed in the writings, plaintiff paid or advanced to the National Bank at Birmingham the amount due from Cleage Brothers, and received from said bank, without indorsement, the warehouse receipt for the cotton. The receipt, which was dated February 2d, 1884, was signed by J. W. Deadrick, who was in fact the clerk or agent of Cleage Brothers, the lessees of the warehouse; but the receipt did not disclose or indicate the fact, and the plaintiff had no knowledge of it until a short time before the commencement of this suit. At the time this receipt was given, Cleage Brothers had a large quantity of cotton in said warehouse; and "at or about said date," as plaintiff's evidence tended to show, "they caused 100 bales of said cotton to be marked with tags, numbered from 1368 to 1468 inclusive, and set apart to itself in the warehouse, for the purpose of including them in said receipt." These bales remained in the warehouse, kept apart from the other cotton,

until about the first June, 1884, when one Payne became the lessee and proprietor of the warehouse; and they were then removed from the warehouse by Cleage Brothers, "without the knowledge or consent of plaintiff," and placed on the platform at the railroad depot, but still kept separate and apart from the rest of their cotton. On or about June 15th, Cleage Brothers, having contracted to sell 50 bales of cotton, of a particular grade or quality, to a purchaser, and not being able to make up the number from the rest of their cotton on hand, took 24 of the 100 bales for the purpose of filling their contract, removing the tags from the bales sold, and placing them on 24 other bales then substituted in their stead. This was done without the knowledge or consent of plaintiff, who was not informed of it until a few days before the commencement of this suit, after the defendants had taken possession of the cotton (including the substituted bales); "and when so informed, plaintiff ratified and assented to such exchange and substitution." In the early part of July, 1884, while the cotton was still on the platform, in charge of an agent of Cleage Brothers, defendants sent their agents and servants, with instructions to remove the tags, and to mark and number the bales in their names; and they succeeded in doing so, against the protest and efforts of the agent of Cleage Brothers, who attempted to prevent it by removing the new tags as fast as they were affixed, but no breach of the peace was committed. On the morning after the completion of this work, the defendants removed the cotton to another warehouse. The plaintiff was informed of these transactions a day or two afterwards, and instituted an inquiry into defendants' claim to the cotton; and afterwards, but before the commencement of this suit, obtained from Cleage Brothers an indorsement of said warehouse receipt.

The defendants adduced evidence showing that the cotton in controversy, with a large quantity of other cotton, was bought by Cleage Brothers with money furnished by them, or paid for by checks drawn on them; and that these transactions were had under and pursuant to agreements between them, which are thus stated in the bill of exceptions: "Defendants' evidence tended to show that, in August, 1883, before Cleage Brothers began the purchase of cotton that season, defendants entered into a contract with them, whereby they agreed to advance to said Cleage Brothers money with which to pay for cotton which Cleage Brothers should buy, at Eutaw and any other points in Greene county,

during said season, by paying their checks on defendants for the price, as the cotton should be purchased by them, on the express condition and understanding, that all cotton so bought by Cleage Brothers, with money so advanced, or paid on their checks, should be the property of defendants, until they were repaid all moneys so advanced, and they should have the right to take, hold, ship and sell the same, whenever deemed necessary for their protection; that otherwise Cleage Brothers should ship and sell the cotton to such persons as they desired, but, whenever they made a shipment, they should give defendants a draft for the proceeds, with bill of lading attached;" and defendants' evidence tended to show that the cotton here in controversy was bought and paid for under this agreement. The bill of exceptions adds in this connection: "On cross-examination of defendants' witnesses on this point, it was shown that this agreement was intended by the parties merely as security for the money so advanced; that in fact Cleage Brothers never actually turned over to defendants the cotton purchased by them with money furnished by defendants, but bought said cotton in their own name, retained possession of it, sold and shipped it in their own name, and otherwise dealt with it as their own property; but that generally, when they sold such cotton, they drew on the purchaser for the purchase-money, in favor of the defendants, attaching the bill of lading to the draft, and left them with the defendants, to be collected and placed to their credit."

The plaintiff had adduced evidence showing that, about October 1st, 1883, Cleage Brothers had entered into a written contract with defendants, relative to the purchase of cotton, and the division of the profits between them; "that said agreement lasted only a few days, when, in lieu of the division of net profits under said written agreement, Cleage Brothers agreed to pay said B. B. Barnes, and did pay him, $500." This written agreement, which was produced, was dated October 1st, 1883, signed by the Cleage brothers individually and B. B. Barnes, and in these words: "For and in consideration of a mutual agreement between" the said parties, naming them, "it is hereby agreed, that B. B. Barnes, as cashier of the Bank of Eutaw, is to furnish no other cotton-buyers with funds with which to purchase cotton; and it is agreed by said Cleage Brothers, that they will use every effort to throw cotton business into the hands of said bank; and it is further agreed by them, that all purchases of cotton made by them

at Eutaw, Stewart Station, Akron, and Boligee, Alabama, are to be paid for by said bank; that they are to keep a regular buyer in the market, and are to make an equal division of any profits arising from the purchase of cotton at the above places, with said B. B. Barnes. It is understood that said Barnes is to be held in no way responsible for any losses, should any occur, on the above transactions, after a final settlement of the season's business. It is further understood, that $500 be paid to J. H. Armstrong, for classing said cotton, and that all necessary expenses arising from the purchase and sale of said cotton must be paid before any division is made. It is understood, also, that said bank is to charge the usual exchange for cashing drafts. This agreement is to be considered as a secret contract until the 29th February, 1884, commencing on the 17th October, 1883."

The defendants adduced evidence showing that, a few days before May 23d, 1884, they learned that Cleage Brothers had obtained from the railroad agent at Eutaw a bill of lading for 100 bales of cotton, "to some point of destination not remembered," and had procured a loan of $5,000 from a bank in Chattanooga, Tennessee, on the faith of said bill of lading, which was attached to their note for the money loaned; that on the 23d May, 1884, the active partner of Cleage Brothers and said Barnes, acting for the defendants, had an interview, at which Cleage requested defendants to pay off this debt, and to have the bill of lading returned and cancelled; "that thereupon they made a computation of the value of all the cotton on hand held by Cleage Brothers in Greene county, and purchased as aforesaid, which consisted of 158 bales at Eutaw and 50 bales at Boligee, in which estimate they included the cotton now in controversy, and also an estimate of the indebtedness of Cleage Brothers to defendants, which was about $6,000, to which was added the $5,000 due to the Chattanooga bank, from which deducting the estimated value of said cotton, there remained a balance of some $2,000 due to defendants; that thereupon it was orally agreed between them, that defendants would pay the $5,000 to the Chattanooga bank, would charge the amount so advanced to Cleage Brothers, take up said bill of lading, and have it cancelled; that Cleage Brothers should secure them with collaterals, which they did; that defendants should hold all the cotton then on hand in Greene county, including the cotton now in controversy, until June 15th, 1884, and if said cotton had not been shipped and sold by Cleage Broth-

ers by that time, and draft for the proceeds given to defend-
ants, then defendants should ship and sell the same, and
apply the proceeds to the payment of said indebtedness of
Cleage Brothers;" and their evidence showed that they had
complied with the terms of this contract on their part, and
that they had no knowledge, notice or information of plain-
tiff's claim to this cotton, until after they had taken posses-
sion of it as above stated, nor any notice of the warehouse
receipt signed by Deadrick. The bill of exceptions here
adds: "But, on cross-examination of defendants' witnesses
on this point, it was developed that defendants never in fact
had actual possession of any of the cotton of Cleage Brothers
under this agreement, nor did they attempt to take actual
possession of any of said cotton until, as above stated, in
July, and that said agreement was only intended as security
for the indebtedness of said Cleage Brothers; and the evi-
dence was conflicting as to the making of said agreement,
the plaintiff's evidence tending to show that no such agree-
ment was ever made." There was a conflict in the evidence,
also, as to the cotton included in the bill of lading held by
the Chattanooga bank; the defendants claiming that it was
the cotton here in controversy, while the plaintiff's evidence
tended to show that no particular cotton was described in the
bill of lading, and that no cotton was in fact delivered to
the railroad agent when he signed and issued the bill of
lading.

On the facts above stated, the court charged the jury, on
request of the plaintiff, "that, if they believe the evidence,
the plaintiff is entitled to recover in this action all of the
cotton seized under the writ which was a part of the 100
bales selected, set apart and included in the warehouse receipt
of February 2d, 1884; and the jury may assess its alternate
value at the market value at Eutaw when defendants took
possession, with interest to the time of trial." To this
charge the defendants excepted, and they here assign it as
error.

The court charged the jury, also, on request of the defend-
ants, "that, if they believed the evidence, they must find for
the defendants for all the cotton in controversy not included
in the 100 bales for which said warehouse receipt was
issued by Deadrick, but which was afterwards substituted by
Cleage Brothers for cotton included in said receipt." The
plaintiff excepted to this charge, and here assigned it as error
on a cross-appeal.

[Bank of Eutaw (Barnes) v. Alabama State Bank.]

J. B. HEAD, with whom was E. W. DE GRAFFENREID, for appellants, defendants below.—(1.) As between defendants and Cleage Brothers, leaving plaintiff's title out of view, the original contract between them gave defendants a legal title to the cotton, as it was purchased and paid for. This contract was not in the nature of a mortgage upon property not then in existence, or to be afterwards acquired, as security for an existing debt; for there was no debt then existing, and none was then contracted. It was simply an executory contract, made in contemplation of future transactions between the parties, and intended to govern their rights and duties as and when those transactions occurred; and it is to be construed as if a separate and independent contract had been made in reference to each particular purchase of cotton, or as if cotton had been purchased and paid for while a statute was of force containing similar provisions; in either of which cases, it can not be doubted, defendants would have acquired ·a legal title to the cotton as purchased, on which they might have maintained detinue against Cleage Brothers. *Greenway v. Fuller*, 47 Mich. 557; *Rees v. Coats*, 65 Ala. 256; *Jackson v. Rutherford*, 73 Ala. 155; *Evington v. Smith*, 66 Ala. 398; Jones on Chattel Mortgages, ch. IV; *Pennock v. Coe*, 23 How. 117; *Seymour v. Railroad Co.*, 25 Barb. 284; *Railroad Co. v. Cowdrey*, 11 Wall. 459. (2.) The subsequent contract of May 23, 1884, had no reference to future purchases, but related only to cotton then on hand; and it certainly gave defendants the right, as against Cleage Brothers, to take peaceable possession of the cotton, as they did. (3.) Against defendants' title under these contracts, even though it be equitable merely, coupled with possession peaceably taken in ignorance of plaintiff's claim, plaintiff can not claim protection, because of the admitted usury in the loan to Cleage Brothers.—*Wailes v. Couch*, 75 Ala. 134; *McCall v. Rogers*, 77 Ala. 349; *Meyer v. Cook*, 85 Ala. 417. (4.) As to the substituted cotton, the charge of the court was correct.—*Ala. State Bank v. Barnes*, 82 Ala. 607.

WEBB & TILLMAN, for plaintiff below, relied on the former decision in this case, 82 Ala. 607–15, and cited the following additional authorities.—*Jackson v. Bull*, 1 John. Cases, 81; *Vaughn v. Marable*, 64 Ala. 66; *Thompson v. Marshall*, 36 Ala. 512; *Burns v. Campbell*, 71 Ala. 288; *Huddleston v. Huie*, 73 Ala. 216; *Morrow v. Turney*, 35 Ala. 133.

CLOPTON, J.—The present record, and the record which was before us on the former appeal, do not materially vary as to the facts.    By the cross-appeals, substantially the same questions which we then decided are again presented, and we are asked to reconsider the conclusions then announced. *Ala. State Bank v. Barnes*, 82 Ala. 607.    On the former appeal we held that the agreement of August, 1883, created neither a mortgage nor a pledge of specific cotton.    Not controverting that a mortgage upon property, to be acquired in the future, does not operate to convey the legal title, if it be to secure any antecedent debt, but is only an agreement to convey when the property is acquired; counsel now insist, that, as there was no existing debt at the time the agreement was made, it was simply a contract prescribing rules for the government and construction of future transactions when had, and that the cotton, under the agreement, became the property of defendants, and the legal title vested in them, as and when the cotton was purchased and paid for.    The terms of the agreement were, that defendants would advance money to pay for cotton purchased by Cleage Brothers in Greene county during the ensuing cotton season, by paying checks drawn by them on defendant as the cotton was purchased, on the condition and understanding that all cotton so bought and paid for should be the property of defendants until they were repaid all money advanced, and that they should have the right to take, hold, ship and sell the same, whenever deemed necessary for their protection; otherwise, Cleage Brothers could ship and sell the cotton to such persons as they desired; but whenever a shipment was made they should give defendants a draft for the proceeds, with bill of lading attached.    The advances were to be made, and the property acquired in the future.

It is manifest from the terms of the agreement it was not intended that the cotton should become the absolute property of defendants, or that the title thereto should vest in them, but merely a security for money advanced—not for a present, subsisting debt, but for future advances.    Had Cleage Brothers, at the time the agreement was made, owned the cotton, it may be that the words, *should be the property of defendants*, would have been sufficient to have constituted a legal mortgage.    At law, a mortgage can operate only on property actually or potentially belonging to the mortgagor. If he does not own the property, there is nothing upon which the conveyance can operate.    The rule is otherwise in equity;

but, even in equity, a contract to transfer property to be subsequently acquired, does not operate as a present alienation, but merely to transfer the beneficial interest immediately on the acquisition of the property. On the principle that a future acquisition, merely expected or contemplated, is not the subject of a mortgage at law, rest all our decisions, holding that a mortgage on an unplanted crop does not pass the legal title, even when the crop comes into existence, unless the mortgagor does some new act for the purpose of carrying it into effect; though it creates an equitable interest, which attaches when the crop comes into existence, and which a court of equity will protect and enforce. The same principle controls the effect and operation of the agreement under consideration.

It is further contended, that the agreement of May, 1884, was made with reference to the agreement of August, 1883, and for the purpose of carrying the latter agreement into effect. The terms of the agreement are stated in the opinion delivered on the former appeal, and need not be repeated. We then ruled, that it created only an equitable lien, such as may exist without the delivery of possession, and did not authorize defendants to take possession of the cotton against the objection of Cleage Brothers, so as to defeat the legal title which plaintiff acquired by the indorsement of the warehouse receipt. The contract of May, 1884, is a separate, distinct and independent contract, designed to meet new and different conditions, without reference to the contract of August, 1883, except to originate an additional equitable lien for the balance due on account of the money previously advanced. This becomes manifest when the contract of October 1, 1883, an intervening contract, is considered. By this last agreement, B. B. Barnes, one of the defendants, and who was cashier of the Bank of Eutaw, stipulated that the bank should pay for all cotton purchased by Cleage Brothers at designated places in Greene county, and would not furnish other cotton buyers with funds with which to purchase cotton. Cleage Brothers were to keep a regular buyer in the market, and use efforts to throw the cotton business into the hands of the bank. The bank was to charge the usual exchange, and the profits to be divided between Cleage Brothers and B. B. Barnes. This agreement continued only a few days, when it was changed; the change being, that in lieu of one-half of the profits, Cleage Brothers agreed to pay Barnes five hundred dollars. It is said that this was a pri-

vate agreement with Barnes, with which the other defendants had no connection. It is apparent, however, that it was made also for the benefit of the bank, which was bound by the stipulations of the cashier and managing partner. The agreement was intended to supersede, and did supersede, the agreement of August, 1883; or, at least, operated to break any possible connection which might otherwise have existed between the latter agreement and the agreement of May, 1884.

On the cross-appeal, plaintiff contends that the indorsement of the warehouse receipt related back to the time of the substitution of other cotton for a portion of the one hundred bales originally included in the receipt, which had been sold by Cleage Brothers, and vested in plaintiffs a title to the substituted cotton sufficient to maintain detinue. The argument is, that by the substitution plaintiff acquired an equitable claim to the substituted cotton, and having such interest, and Cleage Brothers having an interest in upholding its validity, they could, without committing maintenance, put the plaintiff in a position to maintain its lien on the cotton. This may be conceded, but the equitable interest of the plaintiff was inchoate, and not itself acquired until ratification. Defendants had previously acquired an equitable interest, without notice of plaintiff's claim; and a subsequent ratification, by which only an equitable interest is acquired, does not operate to cut off the intervening equity of defendants. Whatever may have been the operation of the indorsement of the warehouse receipt, as between plaintiff and Cleage Brothers, it does not pass, as against the equity of defendants, the legal title to cotton not originally included in the receipt.

After careful consideration of the questions raised and argued, we adhere to, and affirm the rulings on the former appeal.

Affirmed.