FIRST NATIONAL BANK OF LINCOLN, APPELLEE AND CROSS-APPELLANT, V. LINCOLN GRAIN COMPANY, DEFENDANT: GLOBE INDEMNITY COMPANY, APPELLANT AND CROSS-APPELLEE.

FILED APRIL 24, 1928. No. 25199.

*Allen & Requartte* and *Edward F. Leary,* for appellant.
*Hall, Cline & Williams, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ.

EBERLY, J.

In the district court for Lancaster county, Nebraska, the First National Bank of Lincoln, Nebraska, plaintiff,

sued the Lincoln Grain Company, as principal (herein-after referred to as grain company), and the Globe Indemnity Company, as surety (hereinafter referred to as surety company), defendant, on two bonds, each in the sum of $25,000, and each purporting to have been given under the provisions of article II, ch. 69, Comp. St. 1922, for the conversion of certain grain represented by warehouse receipts issued by the grain company, as a public warehouseman, to plaintiff as collateral security for money lent by it to the grain company. A jury was waived and trial to the court had which resulted in a finding and judgment in favor of the plaintiff in the sum of $50,000, and $1,500 taxed as attorney's fees. From this judgment the surety company appeals, and from the amount of attorney's fees taxed the plaintiff has filed a cross-appeal.

The grain company, as a grain dealer, was a copartnership engaged in buying and shipping grain at Lincoln, Nebraska. For this purpose they operated a "grain elevator" or "grain warehouse" located "on or near the right of way of the Chicago, Burlington & Quincy Railroad Company, and which was adjacent to and connected with the switch track of that railroad company. In December, 1923, while still continuously engaged in the business mentioned, the grain company made application in due form, accompanied by a proper bond in the sum of $25,000, for license to carry on and conduct the business of public grain warehouseman in conformity with the provisions of Senate File No. 1, enacted by the legislature of 1915, as amended by Senate File No. 145, enacted by the legislature of 1917. The application was approved by the Nebraska state railway commission and license thereafter duly issued which was kept posted by the grain company in its place of business. Thereafter an additional bond in the sum of $25,000 was obtained by the grain company in order that it might store additional grain. The conditions of these bonds were identical and in the following form:

"Now, therefore, if the said Lincoln Grain Company shall

fully and faithfully discharge and perform all their duties as such public grain warehouseman, and shall fully and faithfully comply with all the laws of the state of Nebraska, and the rules of the Nebraska state railway commission in relation thereto, and shall promptly pay to the storers of stored grain, their successors, personal representatives, or assigns, for all loss and damage of whatsoever nature (except loss due to changes in market value) to grain held in storage by them, in said grain warehouse, including all damage resulting from nondelivery of grain, as provided by law, then this obligation to be void, otherwise to be and remain in full force and effect."

During the period covered by the license and while these bonds, by their terms, were in full force, nine distinct loans were made by the plaintiff to the defendant. Each loan was evidenced by a note executed by the grain company and accompanied by a warehouse receipt as collateral security thereto. Each of these notes contained a clause pledging the warehouse receipt, described therein, "as security for all indebtedness of the grain company to the plaintiff."

The warehouse receipts, themselves, were in form as prescribed by the Nebraska state railway commission. They were executed, issued and delivered by the grain company to plaintiff. Each of these instruments recited in substance, "State of Nebraska, Grain Warehouse Receipt, Lincoln Grain Company;" that the maker on a day certain "received of First National Bank of Lincoln, Nebraska (date and amount stated) bushels, grade (kind of grain), to be stored and insured under the following conditions: (Conditions here set out and specified)." It is further stated: "Upon the return of this receipt and payment or tender of stated lawful charges accrued up to the time of said return of this receipt, the above amount, kind and grade of grain will be delivered within the time required by law to the person above named or his order."

It affirmatively appears in the record that the plaintiff accepted the warehouse receipts in suit relying upon the

bonds given by the grain company and the surety company.

The questions of fact and of law presented by the surety company as basis of its appeal may be summarized as follows: That the corn and wheat mentioned in the various receipts were all the property, in so far as they ever existed, of the grain company; as to certain receipts covering wheat, the wheat described therein was not in the company's elevator or in its possession at date of issuance; that the grain company was not technically a warehouseman; that the grain company was wholly unauthorized to issue receipts covering its own grain in its own elevator as security for its own debt; that the pledge of warehouse receipts issued on its own grain by the grain company as security for its own debt is, in legal effect, a chattel mortgage and is not entitled to protection of the bond.

The controlling legislation in this case is article II, ch. 69, Comp. St. 1922. It was first enacted in 1915 and appears as chapter 243, Laws 1915, under the title: "An act to provide a public warehouse system for handling grain and to regulate the procedure thereunder." It was amended in 1917 and appears as chapter 155, Laws 1917. It is a remedial statute and should receive a liberal and not a restrictive construction. *McIntosh v. Johnson,* 51 Neb. 33. Its validity not having been challenged in any manner in the procedure before us, it is presumed in this intrastate transaction to be valid and subject to application of the rule that one part of a statute must be construed with another that the whole may, if possible, stand. *Ut res magis valeat quam pereat.* Indeed, it may be said that this rule of construction extends, for this limited purpose only, to the inclusion of parts of a statute that are in themselves unconstitutional or that have been repealed. As construed, in entirety, giving due effect to each part, its evident policy is to promote and enforce primary conditions for successful commerce. It sought to provide for, encourage and, so far as possible, compel, through the creation of a "public warehouse system," the course of marketing and storing by and through agencies whose responsibilities were assured by

securities they were required to provide. It is a police regulation for the protection of the citizens of an agricultural state in a matter of vital concern.

True, this statute, by its terms, is limited in its application to "public warehouseman" and "warehousing" as therein defined. These definitions are not common-law definitions but the result of statutory provisions. Under the express terms of the enactment the character and responsibilities of a "public warehouseman" are to be determined in two ways: (1) Its voluntary assumption as provided therein; (2) by the nature of the business transacted.

Thus, section 7224, Comp. St. 1922, provides: "Any grain dealer * * * in this state who receives grain for storage or shipment, or both, may avail himself of the provisions of this act by filing notice of his acceptance thereof with the state railway commission and become thereby a public warehouseman." The language, as to qualities required to undertake this public employment, is broad and inclusive. It obviously includes, as a party qualified to be licensed thereunder with reference to transactions therein contemplated, a grain dealer who never received into, shipped from, handled, deposited, or in any way stored in his warehouse any grain in which any other person or persons had any property right or interest; nor issued, nor offered to issue, any warehouse receipts or storage tickets for grain received there; nor carried on, nor offered, nor attempted to carry on in his warehouse the business of handling, storing, or shipping grain of or for any other person or persons whose warehouse was used, occupied, and operated solely for the purpose of purchasing, handling, and shipping his own grain in his private capacity as a grain merchant. *Cargill Co. v. Minnesota*, 180 U. S. 452.

In the act now under consideration, the state in a proper attempt to promote public good and to provide a safe and dependable public warehouse system has adopted a plan whereby the proprietor of a business of the kind and char-

acter carried on as just described may voluntarily accept its terms, undertake its burdens, and secure its benefits, and become, in fact, what it assumes to create and regulate. When this is done, he is thereafter, in truth, a "public warehouseman" as defined by the statute, possessing all the powers and subject to all liabilities therein provided, and the public thereafter deal with him in that capacity.

It therefore follows that the grain company must be deemed a "warehouseman," authorized to issue "technical warehouse receipts," and responsible for such transactions in which it might engage which, in contemplation of this statute, constitute "warehousing transactions," especially when the same are intrastate in character.

At common law a warehouseman having property of his own in store may make a pledge by executing and delivering an ordinary warehouse receipt which will be valid as between the parties and also against subsequent creditors. 31 Cyc. 806.

The obvious purpose of our controlling statute is not restrictive. Its policy necessitates extension of powers and responsibilities of warehousemen whose business it assumes to regulate. The statutory scheme embodied in it necessarily involves an increased protection to the public and to those who deal in grain. It must be deemed to have been passed by legislators who had in view the general, established course of dealing in grain, the customs of the trade, and the established devices employed in this class of commerce at the date of its enactment.

Therefore, in the light of the common-law principle quoted, and in view of the terms of the legislation before us, no difficulty is found in reaching the conclusion that under this act the right of a warehouseman to issue warehouse receipts on his own grain in storage in his own public warehouse, to secure his own indebtedness, is recognized. This, indeed, is not without authority in jurisdictions other than our own. *Merchants & Manufacturers Bank of Detroit v. Hibbard,* 48 Mich. 118; *National Exchange Bank of Hartford v. Wilder,* 34 Minn. 149; *State v. Robb-Lawrence*

Co., 17 N. Dak. 257; *Cowley County Nat. Bank v. Rawlins-Dobbs Elevator Co.*, 96 Kan. 461; *Alabama State Bank v. Barnes*, 82 Ala. 607; *Broadwell v. Howard*, 77 Ill. 305; *Herrick v. Barnes*, 87 Minn. 475; *Eggers v. National Bank of Commerce*, 40 Minn. 182.

The next contention is that, as to certain warehouse receipts covering wheat, the grain was neither owned by, nor actually stored in the warehouse of, the grain company at the time of issuance. This question of fact the trial court determined against the surety company in a law action. The evidence before it was conflicting, but seems ample to support its finding on this point; at least, there is competent evidence in the record that the grain was actually received, inspected and accepted by the grain company on track in the near vicinity of the elevator with intent to accept and receive title thereto. The switchtrack on which the cars containing this grain was then and there located, it may be said, was not only adjacent to but, so far as use was concerned, was practically an appurtenance of the elevator itself.

It may be conceded in this connection that it is necessary to the validity of warehouse receipts that the warehouseman issuing the same have possession of the goods covered by them. But to say a delivery to a warehouseman to come within the protection of his bond must be in or within the four walls of a certain building would ignore the established course of the business of the trade as well as the terms of the controlling statute. The rule as to delivery to a warehouseman seems to be that, if the property is delivered in the vicinity of its warehouse in such a manner that it may be said to have passed from the control of the owner to the possession and control of the warehouseman, such delivery is sufficient for all purposes. The terms of our controlling statute are in harmony with that idea. It speaks of the grain as "received *at* such warehouse" (not *in* such warehouse) and the duty of issuing warehouse receipts is enjoined upon the warehouseman "upon delivery of grain thereto" (not therein).

In *Bursow v. Doerr*, 96 Neb. 219, this court had occasion to discuss and construe the word "at" in connection with the statutory requirement as to service of summons "by leaving a copy *at* defendant's usual place of residence." It was contended in that case, as it is in this case, that the word "at" as used in the statute means "in" in an exclusive sense, and that the officer making service was therefore required to leave the copy of the summons in some part of the house, just as it is contended here that the grain which a warehouseman receives as such must be received in the warehouse. This contention, however, was not sustained. Rose, J., in delivering the opinion of the court, in reply to this contention, said in part:

"In the general use of the word there is a diversity of meaning, owing to the context. Had the lawmakers intended to limit the meaning to 'in,' they would have used that word. 'At,' in the language quoted, has a wider signification, referring evidently to a point in space. In this sense, some of the definitions given by the Standard Dictionary are: 'In proximity to; in the vicinity or region of; close to; by; near.' "

It was accordingly held that the word "at," as used in the statute then construed, means by, or near, and the case was determined on this basis. The same definition is properly applicable to the language of the public warehouse system statute, "received at any grain elevator," etc., as well as the provisions contained therein requiring every public warehouseman on the day of delivery of any grain "thereto" for storage to issue a lawful receipt to the owner, etc. "Thereto," as thus used, is not synonymous with "therein." "Thereto" is, as Webster defines, "to that or this." "Therein" is, as Webster defines, "in or into that or this place, time or thing."

It follows, in view of the terms of the statute and the evidence of the record, that the action of the trial court in determining that the grain conveyed by the questioned receipts was in possession of the warehouseman at the time

of their issuance is in harmony with and supported by the evidence.

With reference to the last contention of the surety company, in effect, that the transaction between the grain company and plaintiff amounted, in legal effect, to a chattel mortgage, it may be said that the plain terms of the controlling statute, heretofore quoted, impose the clear duty on the warehouseman, licensed thereunder, to deliver grain, covered by warehouse receipts issued by him, upon presentation of such receipts by the hands of a party then entitled to possession of the grain therein described. Whether the transfer of the receipts be considered as a pledge for security or evidence of unqualified ownership, the right of possession would be equally vested in the lawful holder of the receipts.

The bonds executed by the surety company in this case, in terms, expressly reaffirm these statutory obligations and expressly provide and engage that the licensee in whose behalf the bonds are given shall promptly pay to the storers of the grain, their successors, personal representatives, or assigns, for all loss or damage of whatsoever nature to all grains held in storage, including damage resulting from nondelivery of said grain.

Under the facts, as disclosed by the record herein, it may be said that all statutory regulations pertaining to procedure under this act, as expressed therein, appear to have been fully complied with by all parties to this litigation up until the default of the grain company occurred, occasioned by its failure to deliver grain as required by the terms of the warehouse receipts in suit; that the plaintiff made its loans to the grain company in good faith, relying upon warehouse receipts issued and delivered to it by the grain company, and in reliance upon the bonds executed in the grain company's behalf by the surety company, defendant herein; that the surety company received due and valuable consideration for the execution of each of the undertakings set forth in the petition herein and voluntarily assumed the engagements and obligations contemplated by the stat-

ute, and the terms of its bonds issued thereunder. The due enforcement of these obligations so assumed constitutes the subject of an action here presented. The evidence thus sustains the judgment of the district court.

We have not overlooked the other questions discussed in the briefs of appellant, but deem the above and foregoing controlling as to all questions properly presented for consideration by the record in this court.

The cross-appeal of the plaintiff presents the single question of the adequacy of the attorney's fee of $1,500 as taxed by the trial court.

Section 7811, Comp. St. 1922, provides: "In all cases where the beneficiary, or other person entitled thereto, brings an action at law upon any policy of life, accident, liability, sickness, guaranty, fidelity or other insurance of a similar nature, * * * the court, upon rendering judgment against such company, person, or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs."

It is solely a question of fact. The plaintiff's evidence as to the actual services performed by its attorneys in carrying on this litigation to the conclusion of the trial in the district court, including the nature, extent and value of the same, sustains without question that "a reasonable sum as an attorney's fee" for the services rendered was not less than $7,500. The defendant submitted no evidence whatever on this subject in the court below. We find nothing in the record, as an entirety, that in any manner discredits the competency, qualifications or character of any of plaintiff's witnesses on this point or tends to controvert the conclusion they expressed in their testimony.

It may be conceded that a substantial portion of the services which were the subject of this testimony was actually performed in the presence of the trial judge and subject, therefore, to his personal observation; and that in the determination of this question there was necessarily involved the exercise of judicial discretion.

Still, in view of uncontroverted evidence in the record, we find that the district court erred in the exercise of this discretion; that the sum of $5,000 is a reasonable attorney's fee which should have been so taxed in the district court as part of the costs awarded plaintiff.

It follows that the judgment in favor of plaintiff for the amount of its recovery is affirmed, but that the order of the district court awarding attorney's fee and taxing the same is reversed, with directions to enter an order therefor in conformity with this opinion.

AFFIRMED IN PART, AND REVERSED IN PART.